UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REBECCA FOSTER,

       Plaintiff,                             Civil Action No. 17-CV-10781

vs.                                   HON. BERNARD A. FRIEDMAN

THE UNIVERSITY OF MICHIGAN, et al.,

       Defendants.

_____/

## OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is presently before the Court on defendants' motion for summary judgment [docket entry 44]. Plaintiff has responded, and defendants have replied. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide this motion without a hearing.

This is a Title IX case. In its opinion denying defendants' motion to dismiss, the Court summarized plaintiff's allegations as follows:

> In August 2012, plaintiff enrolled in the University of Michigan's Ross School of Business Executive Masters of Business Administration program ("EMBA"). Am. Compl. ¶¶ 18–19. Plaintiff attended the 21-month program at an off-campus location in Los Angeles, California. *Id.* ¶ 20. Plaintiff first reported sexual harassment by a fellow student to the University's Office of Institutional Equity ("OIE") and the Ross School on March 13, 2014. *Id.* ¶ 22. On March 17 and 18, plaintiff supplemented her initial report with a detailed letter and copies of her harasser's emails, texts, and social media posts. *Id.* ¶¶ 24–25. Plaintiff expressed fear for her safety because of his "threatening and intimidating behavior." *Id.*

> On March 21, the OIE issued a no-contact order against the harasser which prohibited him from retaliating against or contacting plaintiff. *Id.* ¶ 27. The OIE also recommended that the Ross School prohibit him from attending the next residency session, but the Ross School declined to do so. *Id.* ¶ 28. Plaintiff learned of the no-contact order on March 31. *Id.* ¶ 32.

Plaintiff told the Ross School she was not satisfied with its interim measures and requested classroom security during the final residency session on the weekend of April 5. *Id.* ¶ 33. She also informed the Ross School that her harasser had violated the no-contact order on March 29. *Id.* ¶ 34. The Ross School declined to provide security because the administration did not want to "escalate the situation." *Id.* ¶ 37. It suggested that plaintiff finish her last weekend of classes in Ann Arbor, but she refused because she wanted to finish her residency with her friends and colleagues in Los Angeles. *Id.* ¶¶ 35–36.

The weekend of the final residency session, the harasser made several social media posts referring to plaintiff as a "scrub" and "ho." *Id.* ¶ 40. He also sent "derogatory and sexually explicit emails" to plaintiff's peers in the program. *Id.* He sat on plaintiff's desk, walked near her when exiting and entering the classroom, and blocked her path in the classroom's aisle. *Id.* ¶ 41. He also sent an email to the program director and the University's Title XI investigator calling plaintiff "a lying slut whore." *Id.* ¶ 43.

On April 8, the harasser sent another email to members of the staff and faculty at the Ross School, stating: "I will graduate, with my class, in person and on time. [Plaintiff] will be barred from the premises and from all programs thereto pertaining. Or things could actually start to become slightly acrimonious, litigious, and epically embarrassing for all concerned parties." *Id.* ¶ 44. Following this email, the Ross School asked the University of Michigan Police Department to perform a threat assessment of the harasser. *Id.* ¶ 45.

The program's commencement was scheduled for May 1 in Ann Arbor. *Id.* ¶ 47. On April 30, the program hosted a social function for all of its students, and plaintiff attended. *Id.* ¶ 49. By this time, she had a personal protective order ("PPO") against the harasser. *Id.* ¶ 51. Defendants did not tell plaintiff about the April 9 email or that her harasser would likely attend the function. *Id.* ¶¶ 50–52. The harasser attended the function and refused to leave until plaintiff called the police. *Id.* ¶ 53.

On May 1, 2014, the OIE issued a twenty-five-page report on plaintiff's complaint. *Id.* ¶ 54. The report found that "[t]he harasser violated the University's policy on Sexual Misconduct by Students by engaging in sexual harassment and retaliation." *Id.* The dean explained the situation to plaintiff's fellow students an hour before heading to the ceremony. *Id.* ¶ 58.

Plaintiff contends that defendants could have adopted stronger measures—such as expulsion or sanctions—as consequences of the harasser's violation of the no-contact order. *Id.* ¶ 56. She argues that defendants functionally pursued a wait-it-out policy, hoping the harasser would stop after the commencement ceremony. *Id.* ¶ 57.

Op. and Order Denying Defs.' Mot. to Dismiss [docket entry 32] at 1-3.

Based on these allegations, plaintiff claims that defendants (The University of Michigan, its board of regents, and the dean of its business school) violated her rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), by remaining deliberately indifferent to this harassment.[1] For relief, she seeks damages, costs, interest, attorney fees, and an injunction requiring defendants to comply with Title IX.

---

[1] In particular, plaintiff claims that defendants' deliberate indifference consisted of:

a. The deliberate decision by the Ross School to allow the Harasser to attend classes during the final residency weekend in April 2014, despite the OIE's order that the Harasser not have contact with Plaintiff;

b. The deliberate decision by the Ross School to request that Plaintiff attend the final residency weekend in Ann Arbor rather than in Los Angeles, in isolation from her classmates of the previous two years;

c. The deliberate decision by the Ross School not to inform Plaintiff of the Harasser's threats to Ross School staff and faculty regarding Plaintiff;

d. The Ross School's failure to put the proper preventative measures in place, in advance, to prevent Plaintiff from being subjected to further contact, harassment, and retaliation by the Harasser during Plaintiff's commencement celebration in Ann Arbor, despite the University's actual knowledge that the Harasser intended to travel to Ann Arbor with the purpose of harassing and embarrassing Plaintiff; and

e. The deliberate decision by the Ross School to avoid and delay disciplining Plaintiff's Harasser because of Plaintiff's impending graduation.

Am. Compl. ¶ 61.

In their motion for summary judgment, defendants argue that based on the record developed in discovery, no jury could find that they were deliberately indifferent to plaintiff's complaints of sexual harassment. Having carefully considered the evidence and the parties' briefs, the Court agrees that there is no genuine issue of material fact as to this element of plaintiff's claim.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Under this provision, student-on-student sexual harassment is a form of discrimination that can subject the school or university where it occurs to liability. In the seminal case so holding, the Supreme Court stated that "recipients of federal funding may be liable for 'subject[ing]' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 646-47 (1999). The Court went on to clarify that "our conclusion here . . . does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action" and that funding recipients will be "deemed 'deliberately indifferent' to acts of student-on-student harassment only where [their] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648. The Court also emphasized that

> [t]he statute's plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs. If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference "subject[s]" its students to harassment. That is, the deliberate indifference must, at a minimum, "cause [students] to undergo" harassment or "make them liable or vulnerable" to it.

*Id.* at 644-45.

In a post-*Davis* decision, the Sixth Circuit commented on the deliberate indifference a plaintiff must demonstrate under Title IX:

> Although no particular response is required, and although the school district is not required to eradicate all sexual harassment, the school district must respond and must do so reasonably in light of the known circumstances. Thus, where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances.

*Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 260-61 (6th Cir. 2000) (footnote omitted). In *Vance*, the Sixth Circuit affirmed the jury verdict in plaintiff's favor, agreeing that defendant had failed to take any effective action, despite knowing that plaintiff had suffered nearly constant sexual harassment by other students over a period of years. Defendant's only response, which "produced no results," was to occasionally speak with the harassers. *Id.* at 262.

In the present case, no jury could find that defendants' response to plaintiff's harassment complaints amounted to deliberate indifference, i.e., that their response was clearly unreasonable under the circumstances. At issue are the actions defendants took in response to the harasser's behavior during the seven-week period between March 13, 2014 (when plaintiff first reported the harassment to the university) and May 1, 2014 (when the harasser was arrested and plaintiff graduated from the EMBA program).

The record establishes the following time-line of events. Although the harassment had been occurring continuously "over the course of the program" and "intensified in the fall and winter of 2013," Pl.'s Resp. at 2, plaintiff first reported it to the university on March 13, 2014. *Id.*

at 3; Defs.' Ex. 6 (PageID 772).  That day, the university's deputy Title IX coordinator within the OIE, Pamela Heatlie, emailed plaintiff a complaint form and a link to the university's sexual misconduct policy and indicated she would contact plaintiff again after receiving the documents plaintiff intended to submit.  Pl.'s Ex. 7 (PageID 993).

In an email dated March 17, an OIE investigator, Rebecca Veidlinger, asked plaintiff to provide her with copies of the text messages plaintiff had received from the harasser.  Pl.'s Ex. 8 (PageID 994).  Plaintiff did so on March 18.  Defs.' Ex. 6 (PageID 770).  Plaintiff also told Veidlinger that she had "concerns regarding an online school session that we have tomorrow, where [the harasser] has been included and I do not want any interaction or mention of my name, nor do I want him to know that I'm attending the session."  *Id.*  Veidlinger responded immediately: "I understand your concerns about tomorrow's class and I am working to communicate with the relevant people to see what can be done to address your concerns."  *Id.*  Following up the next afternoon, Veidlinger emailed plaintiff:

> An email has been sent to the professor teaching the class.  The email directs her not to mention any name of any student participating in the class during her lecture or while she is answering questions. [Professor] Nirav [Mehta] informed me that there is no identifying information available to participants (e.g., no list of others logged on, etc.) so there is no need for a dummy log-on for you.  You[r] presence will not be known to the other students, and any other students' presence will not be known to you.

Defs.' Ex. 7.

In an email to the harasser on March 21, Veidlinger scheduled a telephonic meeting with him for March 25.  Pl.'s Ex. 10 (PageID 1021).  In this email, Veilinger also wrote:

> In the meantime, you are instructed to have no contact with Rebecca Foster.  This includes direct and indirect contact, and includes contact in person, by email, by text message, by phone, or through a third

party. In addition, as you read in the Student Sexual Misconduct
Policy, the University prohibits retaliation of any kind so you are
instructed not to retaliate in any way.

*Id.* Veidlinger interviewed the harasser on March 25 and obtained further information from him on

March 31 and April 8. Pl.'s Ex. 9 (PageID 1003).

On March 28, Veidlinger informed Claire Hogikyan, the managing director of the

EMBA program, by email of the "interim measures" the OIE recommended that the business school

take regarding the harasser. Veidlinger wrote:

[The harasser] should not stay nor take communal meals at the
Beverly Wilshire. [He] should stay at a different hotel and some
arrangements should be made so that he does not eat with the group
in the UM-provided communal dining area at the Beverly Wilshire.
[He and] Rebecca will both be able to participate in person in all of
the class/learning activities, but UM will make sure they are not
seated together (you suggested putting her in the front, him in the
back) and UM will make sure they are not on a team together. [He]
will be instructed to have no contact with Rebecca, which means that
if he is somewhere (other than the classroom) where he learns she is,
he will be expected to leave. Additionally, it is important that
Rebecca have immediate access to a UM faculty/administration
member in LA in case she feels she needs to report any offending
behavior. Can you please determine who the appropriate person is to
be that contact person for her?

Pl.'s Ex. 11 (PageID 1023). Hogikyan responded three hours later:

Thank you for your message. I will ensure we comply with these
steps. As it turns out, I will be in LA during this final residency so
can be a point of contact for Rebecca along with Nirav Mehta who is
the current Associate Director for the LA campus. One of us will
always be present and available throughout the April residency.

Will you be communicating this information to Rebecca?

Regarding a hotel for [the harasser], as I mentioned, in Beverly Hills,
we cannot always find availability. The Montage currently only ha[s]
deluxe rooms available which are extremely expensive. We are
holding a room at another area hotel which is a short cab ride from

the Beverly Wilshire - it is called the Hyatt Regency Century Plaza and will in fact be the hotel we will use for our program beginning in September this year. The room is currently held in my name with my Pcard. We will reimburse him for the cab ride which will be approximately $24 daily unless he has his own car in which case we will pay for parking. Who will communicate this with [him]?

Also, in anticipation for graduation [in Ann Arbor], I have ensured the [harasser] is staying at the Bell Tower Hotel and Rebecca is staying at the Executive Residence.

*Id.* (PageID 1023-24).

On March 29, the harasser sent plaintiff the following one-word Facebook message: "Really."[2] Pl.'s Ex. 12. Plaintiff promptly emailed Veidlinger, attaching a copy of this message and asking if she, plaintiff, should "make further arrangements for my safety." Pl.'s Ex. 13 (PageID 1028). Veidlinger responded hours later, saying she would "address this text with [the harasser] tomorrow" and advising that "[a]s to your safety, you are the best judge of your immediate needs." *Id.* (PageID 1027). Veidlinger spoke with the harasser by telephone on March 31 and reminded him he was not to contact plaintiff. Defs.' Ex. 14. The harasser "apologized for having mistakenly sent [the 'Really' message] and said he would not do it again." *Id.*

---

[2] Two minutes later, the harasser apparently also sent plaintiff the following message, although plaintiff does not mention it in her response brief, as she focuses on the "Really" message:

How i hope i have not trivialized your rampant fears of goblins and attacks. I recognize that you live your life under siege of constant accusation. Look out! Fear and fright poppin up everywhere!...

That is all. Youre dismissed. But do seek the help. And fail fast or settle stat. Time's a tick tockin. You..are..welcome.

Pl.'s Ex. 12.

In an email dated March 31, Hogikyan informed plaintiff of the interim measures being implemented:

> I am writing to inform you that, in compliance with approved and required interim measures as set forth by the Office of Institutional Equity, the following arrangements related to [the harasser] have been made for the April 3-5 residency:
>
> [The harasser] will reside at a different hotel than you. You will remain booked at the Beverly Wilshire as usual. [He] will not be allowed to eat his meals in the student dining area. He may pick up food in a to-go package and eat in a different room to you or go off the premises. Should he decide to pick up food, we will ensure he goes through the line and exists the dining room before you enter.
>
> [He] will be informed that should there be any student social gatherings where you may both attend, if you are present, he is to leave the premises immediately.
>
> During class, Nirav will be present and he will make sure that [the harasser] is seated appropriately out of your sight. You have two immediate points of contact during your stay: Claire Hogikyan will be in residence at the Beverly Wilshire from Thursday April 3rd through Saturday April 5th and can be reached by cell phone at any time at [redacted]. Nirav Mehta will also be in residence at the Beverly Wilshire April 3rd-5th and can be reached by cell phone at [redacted].
>
> Should you have any questions about these accommodations, please contact Rebeca Veidlinger at [redacted].
>
> If you wish to contact me at any time, please do so. I look forward to seeing you in LA.

Pl.'s Ex. 14.

> Hours later, Hogikyan sent the harasser the following email:
>
> I am writing to inform you that, in compliance with approved and required interim measures as set forth by the Office of Institutional Equity, the following arrangements related to you have been made and must be followed for the April 3rd-5th residency:

• You have a hotel reservation at the Hyatt Regency Century Plaza (see below for address) for Thursday night April 3rd and Friday night April 5th. The reservation is currently in my name and the confimiation number is 39373017

• The hotel room and tax only will be paid for by the EMBA program office

• As usual, you are required to place your own credit card at check in for any incidentals during your stay

• The taxi fare between the Hyatt and the Wilshire is $12 plus tip. You will be reimbursed $14 per each direction if you are taking a taxi on Friday morning, Friday evening, and Saturday morning. If you have your own car, parking at the Hyatt and Wilshire will be covered by the EMBA program office. Be sure to have your parking card at the Wilshire validated by Nirav for Friday and Saturday.

• For meals during the residency, you are required to put your food on a plate or in a to-go container and eat in a separate location outside of the Le Petit Trainon dining room. You can either take your food to the Grand Trainon (classroom), the outside pool area or we may have an open conference room (pending the interview schedule). Nirav will be able to guide you appropriately, if you prefer to leave the premises and get your own meals, that is up to you but these will not be reimbursed and you need to work within the class break schedule.

• You are restricted from attending any social activities outside of the scheduled classes where Rebecca Foster is in attendance. Should a student group decide to get together socially after class for example and Rebecca is joining them or you show up and see her there, you are required to immediately leave the premises.

• In the classroom, we will have pre-arranged seating as usual. You are not to interact with Rebecca Foster in any way during class.

If you have any questions about the above interim measures, please contact Rebecca Veidlinger at [redacted]. I will also be present during the residency to ensure compliance with these measures.

Pl.'s Ex. 15.

Plaintiff was not entirely satisfied with these measures. Later on March 31 she sent

Veidlinger the following email:

I'm writing to you in response to Clair's [Hogikyan's] email this morning. I do have further questions regarding the accommodations. I believe the accommodations made for him do not address my safety

10

and further emotional distress concerns, and that I don't want to be in the same room with him, in general and also while I'm in a learning environment.

I have told him to stop multiple times (in person in during [sic] the fight in January, and over text messages multiple times). He then contacted me again on Saturday evening with a retaliatory text, while I was in the middle of studying. This prevented me from doing any further work that evening, and completely disrupted my studying and finalizing a team term project on Sunday. This aided in contributing to a result of our first late assignment, and I haven't been able to focus on work and I feel sick since I received Claire's email this morning.

My questions are:
1. How should I handle class participation and the presentation we're preparing to give in front of class? Class participation is 20% of our grade for each class and I am extremely concerned and distressed to have to speak in front of him, not only at my seat but also in front of the class. I do not want to have to worry about participating, or not participating, as he will be there to hear what I say.

2. How are the breaks handled? We have breaks every 75 minutes and I will have to cross his path many times during this Residency, both at the bathrooms, in the hallways, and getting coffee and snacks.

3. As I've stated previously, I do not want to see him again, and I do not want him to see me, after he has made numerous comments on my body and even that he was "checking out my ass during the middle of a class session", not to mention all of the other factors. How will this be addressed, if he is to see me first at social functions, and then have to retreat?

4. Is he able to discuss the investigation with others, and why his accommodations have changed?

Pl.'s Ex. 16.

Veidlinger responded to plaintiff by email on April 1 as follows:

Thank you for communicating your concerns regarding the upcoming residency. This email addresses those concerns and provides additional explanation regarding the interim measures.

With respect to the class participation and the presentation, we can alleviate you having to speak in front of the Respondent. Only a few of the small groups will be selected to present their work in front of the class. We can direct the professor not to select your group for presentation. For the general class participation, we can tell the professor not to expect you to voluntarily participate and not to call on you for general participation. The MBA program would ensure that both the non-selection of your group and your non-participation in this residency will NOT have an adverse effect on your grade in the class.

We recognize that it is possible, given the concentrated nature of the residency classes, that the Respondent and you might have some incidental contact at break time. With the no contact order in place, the Respondent is instructed that he must leave a room or specific location if he sees that you are already there. Given that you will have a room in the residency hotel, you may find that contact can be avoided if you use the bathroom in your room. If you happen to pass the Respondent in the hallway or on the way to getting a cup of coffee, he knows not to communicate with you in any way. While we have every expectation that he will abide by the no contact order, Claire will be present to support these interim measures. She has provided you with her cell phone number, and you should contact her immediately if any issues arise during the residency. Claire will have access to OIE throughout the weekend, and will call us if necessary.

To address your other concerns, the no contact order would require the Respondent to leave a social function if you are present. Given your discomfort in being around the Respondent, you may choose not to attend a social function if you know he is already there. Finally, both parties are permitted to discuss the investigation with others, and this would include his ability to inform others why his accommodations have changed. However, retaliation is prohibited, so if any conversations or comments occurred which appeared to be retaliatory, you should let OIE know so that we can address those with him.

I also wanted to let you know that I spoke with the Respondent yesterday concerning the text that he sent you on Saturday. He said it was intended to go to someone else, that he mistakenly texted you, and that he was sorry to have done that. We went over the no contact and retaliation provisions and I do not expect anything like that to happen again.

Please let me know if you have any additional questions or concerns.

Pl.'s Ex. 17.  Also on April 1, Hogikyan suggested to plaintiff that she attend the April residency in Ann Arbor, a suggestion plaintiff declined.  Hogikyan Dep. at 69-70; Pl.'s Ex. 18.  Hogikyan made the same suggestion to the harasser, and he declined as well.  Hogikyan Dep. at 65-66.

Very early in the morning of April 4, the harasser sent the following email to Hogikyan, with copies to Mehta and Veidliner:

> Dear whoever,
>
> for the record, nice job.
>
> tonight i graciously allowed yall to alter on spot the rules of engagement, when i was informed that beyond your initial bs of jordan has to grab a dinner plate and disappear from the premises like a refugee, turned out i wasnt even permitted that, because ms foster was already in the room, i was told that i could not even get a dinner plate. Nice job, amateurs. Get your policies straight.
>
> I have politely and graciously endured your retarded witchhunt long enough. In addition to the obvious summary dismissal of this ridiculous case, and the apology you each and all personally owe me, add to that a refund on said meal i'm sure you charged me for.
>
> So afterward, i graciously abdicated participation in tonight's cohort poker night, in abject deference to your psycho hobeast client and your misbegotten rules. For that Youre welcome. And theres where it ends.
>
> so heres what you need to know. Tomorrow night, there is a karaoke outing that i helped organize. And which I will most assuredly be attending. Deal with it. Or fail to, i do not care. It will be taking place in koreatown, where you have zero jurisdiction. If ms foster wishes to attend, she is welcome to do so. But if you think for a minute that i am either going to miss it or abruptly depart it just cause some lying slut whore seeks baseless vindictive retribution, well youve got an inflated sense of your own influence and with that, another thing comin. i'd recommend you protect your shrinking violet client by informing her that i will in fact be there, and if she (or you) have a problem with that, you're welcome to pound sand.

13

For the first time in this specious witch hunt, rather than politely bemusing your inanity, i hereby demand and exact my own civil right. Got it?

She cost me tonight. She will not cost me tomorrow. And neither will you.

Pl.'s Ex. 19.

At her deposition, plaintiff testified that on April 4, the first full day of classes of the April residency, some of the interim measures were not enforced. She testified that the harasser, during a break, "got right in my way and the only way I could exit that area." Pl.'s Dep. at 172. The harasser also stood in front of the beverage table, preventing plaintiff from getting coffee, and sat on plaintiff's desk while speaking with the professor. *Id.* at 172-73. He also "was in the lunchroom. I couldn't get my lunch. Nirav had to come up to me and asked me if I needed help getting lunch."[3]

---

[3] In an email to Hogikyan dated April 10, Nirav Mehta described events that had occurred the previous evening, April 3, between 7:30 and 8:00 p.m.:

> 1) As the last class ended, I monitored both Rebecca and [the harasser] in the classroom. Rebecca stayed near her seat in the front of the classroom, and [the harasser] conversed with fellow classmates in the classroom, first in the back and then in the center of the classroom. Neither one was entering the dining room.
> 2) As I noticed that Rebecca and [the harasser] were among the last remaining students in the classroom, I walked over to Rebecca and let her know that I would ask [the harasser] to grab a plate if he wanted to eat. Rebecca told me that [the harasser] should have grabbed his food already, that she was going inside the dining room, and that [the harasser] shouldn't be allowed inside. Rebecca soon thereafter made it to the dining room.
> 3) . . . I asked [the harasser] if I could talk to him for a minute. The purpose of this was to . . . have a confidential conversation with [the harasser] and explain that Rebecca was already inside the dining room.

> \*   \*   \*

*Id.* at 173.

In an email dated April 5, very early in the morning, plaintiff notified Hogikyan that the harasser "just referred to me as a 'ho' . . . [o]n Facebook." Pl.'s Ex. 21. Hours later Hogikyan sent a message from her iPhone (it is unclear to whom) stating:

> Rebecca just left my room. After being told he was not to contact Rebecca, posted a comment on her Facebook wall - see below. Rebecca was visibly shaking and is very upset about the idea of him being in the classroom with her tomorrow. She also shared some of the hundreds of text messages he has been sending her over the past several months. It is clear that what [the harasser] has been telling me is false at best. Rebecca wants me to call security and disallow him into class in the morning. I am inclined to agree given this new information. Please call me when you get this message regardless of time here. I will answer the phone.

Pl.'s Ex. 22. Early the same morning, Hogikyan emailed plaintiff that she was "working through security to prevent the respondent from attending class today." Defs.' Ex. 25. The same morning, before that day's session began, Hogikyan spoke to the harasser by telephone and "informed him that he had violated the no-contact order, and, therefore, he was disallowed from attending class, and he should not come to the Beverly Wilshire that day."[4] Hogikyan Dep. at 112.

On April 8, the harasser sent the following email to Veidlinger, Hogikyan, and

---

> 6) At the end of the conversation, [the harasser] . . . told me he would not in fact be going into the dining room. . . .

Defs.' Ex. 20.

[4] Plaintiff testified that Hogikyan told her that Veidlinger and Walesby (the university's Title IX coordinator) had recommended that the business school bar the harasser from personally attending the first full day of the April residency. Pl.'s Dep. at 185-88. Veidlinger and Walesby both denied that any such recommendation was made before the April residency began. *See* Veidliner Dep. at 101-03; Walesby Dep. at 59. But even assuming that OIE had made such a recommendation, defendants are entitled to summary judgment for the reasons discussed below.

Professors M. P. Narayanan and Mehta:

Hey Everybody,

Guess what? I am delighted to inform you, that today I conferred with Legal Counsel, and you won't believe what I learned. Wanta guess? Turns out I absolutely did NOT in fact violate any prescribed Do Not Contact order. Iron clad. Wanta learn why? Because the Policy explicitly stipulated that prisoner [redacted] would at least be fed.

The moment that apropos of nothing, Claire Hogikyan so felicitously and antagonistically denied me meal rations Thursday evening, she actually violated the agreed upon policy. And in so doing, she rendered it null and void. Pretty great huh? Not bad for a guy who got a Pass in Business Law. Go ahead, look it up.

The moment Claire sadistically and publically denied me breakfast friday morning, well, at that point her actions unequivocally signaled that she had never entertained any intentions of complying with the mutually agreed upon policy. With willful and callous disregard for my rights and the policy's provisions.

And thus I myself was no longer constrained by any facet of previously agreed upon Do Not Contact Policy. So, see? No violation whatsoever. QED.

So while I presume you lot can see where I'm headed here, let me go ahead and spell it out for ya.

See, this regretable ordeal has been fraught with allegedly objective parties, pleading objectivity, reportedly reserving judgment, and gleefully ignorant of all governing factors, ever siding with none. Well if that be so, then please tell me why do I have to keep figuring out your jobs for you? And why must I continually defend myself against extreme wolf in sheeps prejudice?

You gettin this, MP? Cause I know you well enough to know that you're probably pretty pissed at the egregious mishandling of this case by your minions, and likely dismayed by the pattern of misplaced abuse conducted by same, against an innocent one of your students. In service of a deeply egregiously irrefutably dishonest and guilty party, Ms. Foster.

If I were you. I'd pick up the damn phone, stat, because Nirav's been

graciously carrying all of you to this point. But MP, you Sir are the last bastion of remaining credibility and personal affinity that I will be willing to listen to entreaties from.

This is a ridiculous and frivolous damaging case, perpetrated by a duplicitous and conspiratorial scoundrel. Should've been dismissed out of hand. And you people, you're just wracked with integrity violations, compounded by sexual bias, prejudice, and blind ignorance.

So what do you say we huddle up n get our chit together?

I will graduate, with my class, in person and on time. Ms. Rebecca Foster [illegible] barred from the premises and from all programs thereto pertaining. Or things could actually start to become slightly acrimonious, litigious, and epically embarrassing for all concerned parties.

I will graciously await your phone call, as well as confirmed fulfillment of all prescribed next steps. I'm three hours behind you, so don't sweat the advanced hour.

Pl.'s Ex. 26.

Earlier on April 8, the harasser sent a long, rambling email to Professor M.P. Narayanan, who forwarded it to Hogikyan, portraying himself as a victim of plaintiff's allegedly wrongful claim that he had stalked her. Pl.'s Ex. 27. Among other things, the harasser "demand[ed] my immediate reinstatement to complete good and full standing" and that he "walk in person" at the May 1 graduation ceremony in Ann Arbor. *Id.* (PageID 1057). When this email went unanswered, the harasser sent another testy email to Narayanan, Hogikyan, Mehta, and Veidliner on April 9, suggesting they "[b]est deal with this matter sooner than later. Cause the story is growing deeply institutionally incriminating and embarrassing. And if left untended, could go hilariously viral." Pl.'s Ex. 28.

On April 10, the university's general counsel, Timothy Lynch, sent the harasser the

17

following email:

> This is to acknowledge receipt of your recent emails to University faculty, staff, and students. The language and tone of your emails is wildly inappropriate and offensive. You are harassing others and embarrassing yourself.
>
> You will not be permitted to participate in any commencement activities.
>
> In addition, **any** further harassment by you of University faculty, staff, or students–by email or otherwise–will put your receipt of a degree in grave jeopardy.
>
> Do not contact my clients (the faculty and staff of the Ross School). Do not contact the complainant in the Office of Institutional Equity investigation. Direct any questions you may have to my office.

Pl.'s Ex. 30 (emphasis in original). Simultaneously, Hogikyan informed plaintiff by email that the harasser had been told that day that he was barred from attending commencement. Pl.'s Ex. 31. Two hours later, the business school dean, defendant Alison Davis-Blake, informed Hogikyan and Veidlinger that she was in the process of "removing [the harasser] from the school-wide Commencement program" and that she was "meeting with AI early tomorrow morning to create detailed plans for conducting a threat assessment (using professionals) of our risk in LA and [Ann Arbor] as well as security for Commencement events."[5] Pl.'s Ex. 32 (PageID 1066). Business

---

[5] On April 16, the business school's chief administrative and diversity officer, Al Cotrone, emailed Davis-Blake that the university police department

> does not view the content of the messages that you shared with me as high on a threat assessment level. They found no specific threats and nothing in the tone or wording that implied great risk to the public or to any of our faculty staff or students.
>
> Nonetheless, we have asked for a constant presence during the time of the LA cohort's commencement attendance.

school representatives alerted the university's police department of the situation, provided it with five of the harasser's recent emails as well as Lynch's email to the harasser, and requested a "threat assessment" regarding the upcoming May 1 commencement. Pl.'s Exs. 34 and 35.

On April 11, plaintiff asked one of her professors, M.P. Narayanan, to give her two extra days to finish an assignment, "[g]iven the extreme circumstances of last weekend." Defs.' Ex. 10. Professor Narayanan gave plaintiff the additional time. *Id.*

On April 16, an attorney whose office is located in Ann Arbor emailed Lynch to "confirm[] that my client, [the harasser], will not attend the May 1, 2014 commencement activities on the Ann Arbor campus of the Ross School of Business." Pl.'s Ex. 36.

On April 17, plaintiff obtained a temporary restraining order (pending a hearing on May 5) from the Los Angeles County Superior Court, requiring, among other things, that the harasser not have any contact with plaintiff and that he remain at least one hundred yards away from her. Pl.'s Ex. 35 (PageID 1080).

On April 28, the assistant general manager of the business school's executive learning and conference center, Doug Pugh, provided a photograph of the harasser to Sgt. Gary Hicks of the university's police department by email. His message to Hicks stated:

> After speaking to Claire Hogikyan, the Director of the EMBA, she requests coverage at the following places and times:
> Wed. 4/30          Dinner               ELCC Dining Room   5pm-10pm
> Thu. 5/1            Graduation        Ross Wintergarden/    8am-2pm
>                                                     Blau Auditorium
> As I mentioned, she asked that there be no uniforms, just plain clothes. She envisions having you and whomever covers the graduation close-by, but as inconspicuous as possible.
> She requested your cell number to call, if something happens that is

Defs.' Ex. 30 (PageID 814).

not a full blown emergency but urgent in nature.  Please confirm as
to whether you are ok with my giving her your number.

Pl.'s Ex. 37.  Hicks asked Pugh to provide Hogikyan with Hicks' cell phone number, which Pugh

did.  *Id.*  Hogikyan then forwarded Hicks' cell phone number to seven of her "team" members, and

advised them that "we have plain clothes security during our commencement activities.  Please keep

this cell number handy."  *Id.*

On April 29, Hogikyan sent the following email to Cotrone and other business school

officials:

I just received an email message from Rebecca Foster indicating that
she has become aware that [the harasser] is in fact traveling to Ann
Arbor.  Rebecca has a temporary restraining order in place but
believes it only pertains to LA County - she is checking with her
attorney.

I have been in contact with Sgt. Gary Hicks who is our on campus
security assigned as our point of contact.  I just left him a message to
please phone me so that we can review our plans.  I also have his cell
phone number and have distributed this to my staff.  The front desk
staff in the [Executive Residence] have [the harasser's] picture and
know to be "cautious" but because we do not have a no trespassing
order in place, we can only observe.

Pl.'s Ex. 38.  Cotrone immediately emailed Davis-Blake that "[w]e are now having Sargent Hicks

stay resident 4 nights.  We have also alerted the other officer (Butsky) of the note below," referring

to Hogikyan's email about the harasser possibly coming to Ann Arbor.  *Id.*  Davis-Blake

immediately asked Cotrone to "contact Claire and find out what evidence, specifically, Rebecca has

that [the harasser] is traveling to Ann Arbor.  I need it ASAP."  *Id.*  Plaintiff's evidence was a

Facebook post, which she had discovered that morning and forwarded to Hogikyan, in which the

harasser stated, "Wheels up for Ann Arbor . . . Commencement 5/1 caps 21 months of challenging

work."  Pl.'s Ex. 39.

Late in the evening of April 29 or early in the morning of April 30, plaintiff entered a common lounge area at the business school's Executive Residence, where she was staying in Ann Arbor, and saw the harasser's "reflection in the glass." Pl.'s Dep. at 238-39. She immediately left the lounge and found Sgt. Hicks in the lobby. *Id.* Hicks was unaware of the TRO, but plaintiff provided him with a copy. *Id.* at 240-41. Hicks accompanied plaintiff to the lounge area, where he found the harasser and escorted him out of the building. *Id.* at 244; Pl.'s Ex. 40 (PageID 1100).

On April 30, in the morning, Veidlinger emailed the university police chief, Robert Neumann, and a university police sergeant, Christian Carelli, a copy of the TRO (or "PPO," as she referred to it) plaintiff had obtained in Los Angeles. Defs.' Ex. 35. Veidlinger indicated that plaintiff "went to the Washtenaw county court this morning to get confirmation the PPO is valid/enforceable in Michigan, and she is waiting to hear back." *Id.* That afternoon Neumann responded by indicating "there should be no problem with enforcement." *Id.*

The night of April 30, or early in the morning of May 1, university police officers located the harasser outside of a karaoke bar in Ann Arbor, arrested him, and took him to the county jail. Pl.'s Ex. 40 (PageID 1102-03). A Michigan circuit judge ordered that university policy officers transport the harasser to Detroit Metropolitan Airport and place him on a flight back to California, which they did. Pl.'s Exs. 40 (PageID 1103-04) and 41.

Also on May 1, Veidlinger completed her 25-page, single-spaced "sexual misconduct investigation report" on this matter.[6] Defs.' Ex. 38. She concluded that the harasser violated the

---

[6] On April 18, Veidlinger emailed a copy of her draft report to plaintiff and invited her to review it and to submit any "comments or clarifying information you may have" by April 25. Defs.' Ex. 40 (PageID 867). Plaintiff provided "rather lengthy" comments on April 25. *Id.* (PageID 865).

university's sexual misconduct policy and referred the matter to the director of the office of student conflict resolution for follow-up. The harasser was found to have violated the university's sexual misconduct policy, and sanctions were imposed. Defs.' Ex. 39 (PageID 858). On appeal to the university's appeals board, that body, on September 11, 2014, recommended that the harasser have no contact with plaintiff; that the harasser's transcript carry a permanent "notation of non-academic conduct violation"; that the harasser's diploma and transcript not be held up; that the harasser be barred from university properties, events, and networks for a period of three years; that the harasser be required to meet once annually for three years with officials of the office of student conflict resolution ("OSCR") to ensure he had not contacted or retaliated against plaintiff, or trespassed on university property; and that future schools and employers be advised. *Id.* (PageID 860-62). The vice president for student life accepted these recommendations with only one modification, namely, that there would be only one OSCR meeting, in April 2015, and that the harasser's access to the university campus would remain in effect unless modified at that meeting.

Plaintiff agues that defendants should have done more to protect her from the harasser. She claims that defendants' "deliberate indifference prolonged the harassment and was woefully insufficient." Pl.'s Br. at 1. Plaintiff argues that defendants should have dealt with the harasser more aggressively by requiring him to attend the April residency remotely (e.g., via Skype) or in Ann Arbor, obtaining a "no trespass" order, preventing him from entering the Executive Residence, and/or suspending or expelling him. *Id.* at 1, 7, 14, 21, 23. Plaintiff also faults defendants for failing to inform Sgt. Hicks that she had obtained a TRO in Los Angeles. *Id.* at 15. *See also supra* n.1.

Rather than responding to plaintiff's harassment complaints with deliberate

indifference, the record plainly demonstrates that defendants responded promptly, compassionately, and effectively. When on March 13 plaintiff first complained about the harasser's text messages and other unwanted conduct, a representative of the OIE responded immediately by providing plaintiff with the university's sexual misconduct policy and a complaint form. Four days later, Veidlinger asked plaintiff to supply her with the unwanted text messages. When, on March 18, plaintiff told Veidliner she did not want the harasser to be aware that she was participating in an online class, Veidlinger immediately accommodated plaintiff by contacting the professor and making arrangements to hide all class participants' identities. On March 25, one week after plaintiff provided her with copies of the harasser's text messages, Veidliner spoke with the harasser by telephone, and on March 28 she instructed him to have no further contact with plaintiff and to not retaliate against her.

When, on March 29, the harasser sent plaintiff the "Really" text message, plaintiff complained to Veidlinger who, on March 31, spoke to the harasser and reminded him of the no-contact order. Also on March 31, Hogikyan told the harasser that various mandatory interim measures directed by the OIE were being implemented regarding the upcoming April residency: he was required to stay at a different hotel than plaintiff; he was not permitted to eat meals in the student dining area; if he attended a student gathering at which plaintiff was present, he was to leave immediately; and in class, he was to be seated out of plaintiff's sight. When, on March 31, plaintiff contacted Veidlinger with questions and concerns about these interim measures, Veidlinger immediately responded to plaintiff with accommodating solutions.

Plaintiff alleges that on the first day of the April residency, the harasser violated some of the interim measures by, for example, blocking her access to the beverage table and sitting on her

desk while speaking with a professor. Plaintiff does not allege that she called these violations to the defendants' attention. However, there is evidence, which plaintiff does not dispute, that Professor Mehta ensured that she and the harasser did not come into contact in the dining room that evening. The evening of the first day of the April residency, the harasser violated the no-contact order by calling plaintiff derogatory names on Facebook. In response, Hogikyan spoke directly with the harraser hours later and barred him from participating in the rest of that weekend's classes.

On April 10, in response to his inflammatory emails sent to university faculty (but not to plaintiff), the university's general counsel told the harasser that he was barred from participating in commencement events and that he must not contact faculty or plaintiff. Hogikyan immediately informed plaintiff that this action had been taken. The same day, Davis-Blake began making arrangements to have the university police department conduct a "threat assessment" and provide security for the commencement activities.

Shortly before commencement, Pugh provided Sgt. Hicks with plaintiff's photograph, made arrangements for police presence at the commencement activities, and provided various business school officials with Hicks' cell phone number. When, on April 29, Hogikyan received a message from plaintiff that, based on a Facebook post she had seen, plaintiff believed that the harasser was intending to attend commencement (although the harasser's attorney had recently assured the university's general counsel to the contrary), Hogikyan immediately passed on this information to various business school officials and to Sgt. Hicks. At the same time, Cotrone indicated that Hicks would "stay resident 4 nights," apparently thereby increasing police presence for the duration of commencement.

When, on April 29 (or early April 30), plaintiff saw the harasser's reflection in the

lounge, she, thanks to defendants' foresight in making security arrangements, was able to find Hicks immediately, and he promptly removed the harasser from the building. In the morning of April 30, Veidlinger provided the university police chief with a copy of the TRO plaintiff had obtained in Los Angeles, and later the same day (or in the early hours of May 1) the harasser was located, arrested, and jailed, and then placed on an airplane back to California.

Defendants' actions in this case contrast sharply with those of the defendants in cases where Title IX liability has been found. The court in *Vance*, which plaintiff cites throughout her response brief, summarized three such cases:

> In *Davis*, a male student fondled a female student's breasts; spoke in vulgar language to her; engaged in sexually suggestive behavior toward her; told her "I want to get into bed with you" and "I want to feel your boobs"; and placed a door stop in his pants and acted in a suggestive manner toward her. 526 U.S. at 633–636, 119 S.Ct. 1661. In addition, other girls, who the male student harassed, sought an audience with the principal, which a teacher denied. When plaintiff's mother asked the principal what disciplinary action he planned to take against the student, he responded "I guess I'll have to threaten him a little bit harder." *Id*. at 635, 119 S.Ct. 1661. Although both plaintiff and her mother informed plaintiff's teacher about the incidents, the school took none of the following action: disciplining the student, separating plaintiff from the student, or establishing a sexual harassment policy or procedure. *Id*. at 634–635, 119 S.Ct. 1661. The Supreme Court stated that this lack of response could suggest "deliberate indifference on the part of the Board, which made no effort whatsoever either to investigate or to put an end to the harassment." *Id*. at 654, 119 S.Ct. 1661.
>
> In *Murrell v. School District No. 1*, 186 F.3d 1238, 1243 (10th Cir.1999), a male student sexually assaulted plaintiff, a physically impaired special education student, on several occasions. On one occasion, upon discovering the two students, a janitor told them to clean up and returned them to class. Although the teachers allegedly knew about the assault, they did not inform plaintiff's parent. *See id*. at 1244. After another sexual assault, plaintiff's teachers allegedly told her not to tell her mother about the incident and to forget that it happened. *See id*. At no time did the school ever inform law

enforcement, investigate, nor discipline the offending student. *See id.*
In upholding plaintiff's claim, the Tenth Circuit found defendant
school district deliberately indifferent under Title IX. *See id.* at 1248.

\* \* \*

In *Doe v. School Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 60–64
(D.Me.1999), the court held that a jury could find that the following
amounted to unreasonable responses in light of known circumstances:
(1) after various school personnel complained to the principal that a
female teacher was having sex with male students, the principal did
not investigate nor confront the female teacher with the specific
allegations; (2) the principal warned a substitute teacher that she
could be sued for slander for telling him that the female teacher was
having sex with a male student and made no effort to investigate the
matter; and (3) rather than an investigation, the superintendent told
the principal to question some of the male students about the
allegations.

*Vance*, 231 F.3d at 261-62. And in *Vance* itself, where the defendant school district was also found

liable under Title IX, plaintiff was sexually harassed, both verbally and physically, by fellow

students over a three-year period, but the school officials to whom she complained (including

teachers, counselors, and principals) did essentially nothing to curb the harassment. Likewise, in

*Patterson v. Hudson Area Sch.*, 551 F.3d 438 (6th Cir. 2009), another case plaintiff cites, the court

of appeals found that a jury should determine whether the defendant school district had been

deliberately indifferent to plaintiff's complaints of daily harassment, both physical and verbal, over

a period of several years, given that teachers and principals were aware of the harassment but

responded only with methods they knew were ineffective.

By contrast to the inaction of the defendants in these cases, defendants in the present

case responded immediately and effectively to plaintiff's complaints and to the harasser's texts,

emails, and other actions. As a result, the harasser's text messages to plaintiff, his Facebook posts

mentioning her, and his physical interaction with her all but stopped. When the harasser violated

defendants' directive to stay away from plaintiff and to not attend commencement events, he was promptly removed from the lounge where he was first discovered and, very shortly thereafter, arrested and put on an airplane home. Under these circumstances, it would be simply impossible for any reasonable jury to characterize defendants' response as "deliberately indifferent" or "clearly unreasonable." Accordingly,

IT IS ORDERED that defendants' motion for summary judgment is granted.


s/Bernard A. Friedman
Dated: February 21, 2019          BERNARD A. FRIEDMAN
          Detroit, Michigan          SENIOR UNITED STATES DISTRICT JUDGE